IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF:<br><br>CLIFFORD WAYNE BURNETT,<br><br>Debtor(s). | CASE NO. BK 22-40714-TLS<br><br>CHAPTER 12 |

ORDER

This matter came before the Court on October 3, 2024, for trial on the confirmation of the debtor's sixth amended Chapter 12 plan (Fil. No. 222) and objection by creditors Greg Fleecs and Dale Lind (Fil. No. 228).[1] Terry K. Barber appeared for the debtor, and Michael S. Borders appeared for the objecting parties. Post-trial written arguments have now been submitted and the matter is ready for decision. This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(L).

For the reasons discussed below, the debtor's sixth amended Chapter 12 plan is confirmed.

**BACKGROUND**

The creditors who have objected to the confirmation of the debtor's plan of reorganization hold post-petition judgments arising from the debtor's pre-petition breach of agreements concerning cattle owned by them and cared for by the debtor. Fleecs filed a state court lawsuit against the debtor in 2019 to recover certain sale proceeds and damages for missing cattle. Lind was granted leave to intervene in the lawsuit to pursue similar claims. However, the debtor repeatedly used the bankruptcy system to stymie the progress of the civil suit as well as the collection efforts of the debtor's former lender, Custer Federal State Bank. The present bankruptcy case was filed on the eve of the state court trial in August 2022, and Fleecs moved for relief from the automatic stay.[2] This Court granted such relief *ex parte* to permit the state court lawsuit to proceed to judgment in order to promptly liquidate Fleecs' claim. *See* text order at Fil. No. 15. In November 2022, the District Court of Custer County, Nebraska, entered judgment against the

---

[1] Also up for consideration is a Motion to Dismiss filed by Fleecs and Lind (Fil. No. 229). After a hearing, that motion was deferred pending the outcome of this plan confirmation trial. *See* Order Deferring at Fil. No. 249. All parties agreed that if this Sixth Amended Plan cannot be confirmed, then the Motion to Dismiss should be granted.

[2] Both Fleecs and Lind sought and obtained relief from stay in debtor's prior bankruptcy case (BK20-40125). For reasons that are not clear, Lind did not seek similar relief from stay in this case to proceed with the state court lawsuit, though it seems all parties proceeded in state court as if the relief order granted to Fleecs applied to all parties in the case. Fleecs and Lind did both later obtain relief from stay to negotiate certain cattle sale checks that were in dispute in the state court case.

debtor and awarded $851,432.50 plus interest to Fleecs on his breach and replevin claims and awarded damages of $127,475.00 plus interest to Lind on his similar claims.

Despite the pending state court litigation at the time of bankruptcy filing, these creditors did not timely file proofs of claim in the bankruptcy case. The deadline for filing proofs of claim in this case was November 1, 2022, but Fleecs filed his late claim for the judgment amount on December 28, 2022, without leave of the court. He listed $400,000.00 of the claim as secured by checks from the sale of cattle, and the balance as unsecured. In late December 2022, Lind filed his proof of claim and simultaneously filed a motion to allow his late-filed claim to be treated as timely filed (Fil. No. 57), asserting that he had not received notice of the bankruptcy case because an incorrect address was listed in the creditors' matrix and noting that he did not know the amount of his claim until the Custer County District Court entered its judgment. This Court heard the motion on February 6, 2023, and denied it because none of the exceptions to timely filing contained in Federal Rule of Bankruptcy Procedure 3002(c) were applicable. Proofs of claim that are not timely filed and do not fall within the exceptions listed in Rule 3002(c) are barred under 11 U.S.C. § 502(b)(9). *In re Moore*, Case No. 19-01228, 2021 WL 4823523 (Bankr. N.D. Iowa Oct. 14, 2021). Therefore, neither Fleecs nor Lind holds an allowed claim in this case.

As part of the bankruptcy process, the debtor filed a number of Chapter 12 plans, and Fleecs and Lind objected each time. A trial was held in June 2023 regarding the debtor's second amended plan, resulting in denial of confirmation. *See* Fil. No. 169. The Court directed the parties to seek a consensual resolution and ordered them to engage in mediation of the issues raised in the third amended plan (Fil. No. 187). Despite the exchange of a number of good-faith offers, the parties did not resolve their dispute (Fil. No. 201). The Court then directed the debtor to propose a new amended plan, to be "crafted with the benefit of the experience from mediation." (Fil No. 202). The cycle of amended plans and objections continued until the Court set a status hearing on the sixth amended plan, Fleecs' and Lind's objection thereto, Fleecs' and Lind's motion to dismiss the case, and the debtor's certification and request for confirmation trial. There were no other plan objections and, in fact, the Chapter 12 trustee consented to confirmation of the sixth amended plan. At the status hearing held on July 31, 2024, the Court suggested that the debtor's request be granted and the confirmation issues set for trial, with the result that either the plan would be confirmed or the case would be dismissed. The parties agreed, which led to the October 3rd trial and this order.

## THE SIXTH AMENDED PLAN AND OBJECTIONS

In his sixth amended plan, the debtor proposes to pay a minimum of $3,850.00 over three years for distribution by the Chapter 12 trustee. There is only one secured creditor, which holds the mortgage on the debtor's house and will be paid directly. The plan lists six unsecured creditors, two of whom did not file proofs of claim, one who withdrew his proof of claim, one timely filed claim, and Fleecs' and Lind's untimely filed claims. The plan does not propose to pay anything to the unsecured creditors.

Fleecs and Lind base their objections on the plan's alleged lack of feasibility and good faith, and its inability to meet the best interests of creditors test. They assert the debtor lacks the income necessary to make plan payments; fails to account for certain assets disclosed in previous bankruptcy schedules; and minimizes the value of his real property by using its assessed value

rather than its fair market value. They question the debtor's sincerity in seeking bankruptcy relief and suggest he has used the bankruptcy system solely to delay the state court lawsuit and hinder the creditors' ability to liquidate and collect their debt. They argue that the plan does not propose to pay each unsecured claim at least as much as would have been paid in a Chapter 7 liquidation. These arguments invoke elements of confirmation under 11 U.S.C. §1225(a) and will be addressed in turn below.

The creditors also argue the plan fails to provide that all of the debtor's projected disposable income over the term of the plan will be applied to payments under the plan as required by §1225(b)(1)(B). This argument can be dispatched with little discussion, as by the language of the statute the Court considers the disposable income issue only "[i]f the trustee or the holder of an allowed unsecured claim objects" to confirmation. §1225(b)(1). The sole objection comes from Fleecs and Lind, who as noted above do not hold allowed unsecured claims, so this portion of the objection is denied.[3]

At the end of the trial, the Court also asked the parties for their thoughts as to how much weight should be given to the Chapter 12 trustee's consent (Fil. No. 232) to confirmation of the sixth amended plan[4], in light of the creditors' objections to confirmation. The debtor cites Montana case law for the premise that the bankruptcy court should give "significant weight" in favor of plan confirmation to a trustee's consent to confirmation. *In re Bassett*, 413 B.R. 778, 786 (Bankr. D. Mont. 2009); *In re Rankin*, No. 10-62340-13, 2011 WL 204764, at *5 (Bankr. D. Mont. Jan. 21, 2011); *In re Launderville*, No. 11-61117-13, 2011 WL 4900022, at *2 (Bankr. D. Mont. Oct. 14, 2011); *In re Stampley*, No. 12-60732-13, 2013 WL 492490, at *2 (Bankr. D. Mont. Feb. 8, 2013).[5] None of these cases discuss the reasoning for granting significant weight to the trustee's consent, however, but merely state it as a proposition of law.

On the other hand, Fleecs and Lind favor less reliance on the consent, pointing out that the trustee consented before seeing the debtor's third and fourth quarter operating reports and without

---

[3] This, of course raises the related question of whether Fleecs and Lind have standing to object to confirmation under 11 U.S.C. §1225(a) as well. Section 1225(b) has an express requirement that the objecting party be the trustee or the holder of an "allowed unsecured claim." No such requirement exists under section 1225(a). In fact, that section simply states that "the court shall confirm a plan if" certain requirements are met. It is up to the debtor to show those elements have been met and, as holders of sizeable judgments against the debtor, Fleecs and Lind certainly are parties in interest when it comes to confirmation of this plan and/or dismissal of this case Therefore, they have standing to object.

[4] The duties of a Chapter 12 trustee include appearing and being heard at any hearing that concerns the confirmation of a plan. 11 U.S.C. § 1202(b)(3)(B). The trustee's consent was filed pursuant to Local Rule 3015-1 (C) ("The court will not confirm a Chapter 12 plan unless the trustee files a consent to confirmation. The trustee does not have to file the consent unless the debtor provides the trustee a plan summary. If the trustee does not file a consent, the debtor may file a request for hearing.").

[5] These are all Chapter 13 cases.

considering the debtor's allegedly erroneous valuation of his real estate. The creditors correctly state that, under the Bankruptcy Code, the Court has an independent "duty to determine whether the plan has met all the requirements necessary for confirmation." *In re Weldin-Lynn, Inc.*, 79 B.R. 409, 410 (Bankr. E.D. Ark. 1987); *In re Snider Farms, Inc.*, 83 B.R. 977, 986 (Bankr. N.D. Ind. 1988).

Accordingly, the Court will reach its own conclusions as to the plan's confirmability, bearing in mind the trustee's lack of objection to confirmation but noting that he did not have access at the time to all of the evidence now before the court.

### FACTS

To give context to the discussion that follows, the Court sets out the following facts:

The debtor testified that he is 65 years old. He has farmed since he was 18 years old. He previously owned 1,600 acres (as well as related farming equipment) but lost them to foreclosure in 2021. This is the sixth Chapter 12 case he has filed. He received discharges in his 1993 and 1998 cases. His 1995, 2008, and 2020 cases were dismissed for various reasons. The debtor's wife also filed Chapter 12 cases in 2009 and 2021; both were dismissed.

The debtor testified that he farms, drives a truck, and works as a mechanic. At the time he filed this case, he worked for an agricultural inputs and grain cooperative in addition to farming, providing agricultural services for hire, and performing vehicle repair. The employment at the co-op ended in February 2024. The debtor testified that since then, he has done significantly more mechanic work, provided commercial spraying services, and built fence, all of which provided about as much income as he made at the co-op. His tax returns show that farming has not been a profitable enterprise for him since at least 2018, but his outside income and his wife's income support his family.

The debtor and his wife own about 23 acres where they live. The house they reside in is on a 1.93-acre tract, and an adjoining 21.5-acre parcel contains an older house, farm outbuildings, and the water well that supplies both tracts. On Schedule A/B, the debtor values the smaller tract at $71,010 and the larger tract at $90,789. He valued his half of the ownership interest in these properties at $80,899 ($35,505 attributable to the smaller parcel and $45,394 on the larger parcel). The smaller tract is subject to a deed of trust, but the mortgage holder did not file a proof of claim in the bankruptcy case. The debtor lists the amount owed on the home as $97,339. The debtor claims a homestead exemption of $60,000 in the home[6], but there appears to be no equity to protect if the property value and amount of the mortgage are accurately listed in the schedules. If the exemption is applied to the larger tract, there is only $45,394 of equity to exempt, according to the schedules. The debtor also lists a debt of $18,737 owed to his former attorney and evidently secured by the larger tract, which would further reduce the equity available to exempt. No proof of claim was filed for this debt. In his liquidation analysis, the debtor valued the real property at

---

[6] A debtor who owns a home with a non-filing spouse may claim the full amount of the homestead exemption from his half of the ownership interest in the property under *In re Marron*, Case No. BK23-80554, 2024 WL 497266 (Bankr. D. Neb. Feb. 8, 2024).

$161,789, less secured debt of $116,076 (the mortgage and the lien for attorney fees), leaving total equity of $45,713 and claiming that amount as exempt.

The debtor's farming operation consists primarily of raising alfalfa and cane. He does not feed livestock at this time. He rents approximately 80 acres not far from his home and shares the crops with the landowners. The farm equipment he uses is owned by his wife, although he does rent a grain drill from a dealer for some of the planting. At the time of trial, the debtor's crop inventory consisted of 154 bales of mixed alfalfa and oats[7], and 73 bales of alfalfa. In addition, the debtor was planning to bale the cane shortly after the trial and expected it to yield three tons per acre on 11 acres. He would receive half of the total.

The debtor conservatively estimated the value of the oats-alfalfa mix at approximately $8,000 (testifying that the bales weigh around 1,400 pounds apiece and could be sold for $75-$85 per ton). He estimated the value of the alfalfa bales at approximately $5,000, and he estimated the value of his share of the cane bales at approximately $1,600. However, the debtor testified that he did not have a buyer for any of the bales at the time, although he believed he could find a buyer within 30 to 60 days.

With regard to the anticipated plan payments totaling at least $3,850, the debtor testified he could pay the first installment of $1,280 immediately and could make the second payment as soon as the hay crop sells. He testified that he believes the total payments over the life of the plan could very well exceed the proposed minimum payment.

The cash-flow projection attached to the debtor's plan includes the $52,701 in off-farm income that he earned in 2023 from the co-op. He testified that he intends to offset the loss of that income with his mechanic work, commercial spraying, and fence-building work. His operating reports show he earned $25,528.69 for that work between April 1 and September 24, 2024, which is more than he was earning at the co-op during similar time frames. Of course, some of his work for hire is seasonal so the income from such work will be greater during the growing season than it will be in the winter months.

The quarterly operating reports submitted as evidence at Fil. No. 279, covering the time period from the second quarter of 2022 through most of the third quarter of 2024, show disbursements exceeding receipts during most quarters, but the debtor is able to maintain a positive bank balance.

The debtor testified that in the future he hopes to be able to resume feeding a few head of cattle. The plan appendix also explains that the debtor does not have an operating loan, and would only purchase cattle when he has the cash to do so. He does not intend to feed cattle on behalf of anyone outside of his immediate family again. He owns sufficient pasture for livestock grazing. If

---

[7] The debtor testified that the alfalfa-oats mix is a new crop for him this year. The landowner provided the seed, and the debtor planted and farmed it. The landowner agreed to let the debtor have the entire alfalfa-oats crop this year so the debtor could recover his labor and machinery costs for it. Next year, the debtor and landowner will split the alfalfa-oats crop 50/50, just as they do the hay and cane crops.

he were able to get back into the cattle business, he has a written agreement with a neighbor to use her bull for breeding in exchange for some of the trucking he does for her each year.

## DISCUSSION

Section 1225(a) of the Bankruptcy Code sets forth each element that must be established before a Chapter 12 plan can be confirmed. The burden rests with the debtor, as the plan proponent, to establish all of the elements essential to confirmation under Chapter 12. *Michels v. Maynard Sav. Bank (In re Michels)*, 305 B.R. 868, 871-72 (B.A.P. 8th Cir. 2004). Fleecs and Lind dispute the debtor's ability to meet three of those § 1225(a) elements:

> (a) Except as provided in subsection (b), the court shall confirm a plan if —
> . . .
> (3) the plan has been proposed in good faith and not by any means forbidden by law;
> (4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date;
> . . .
> (6) the debtor will be able to make all payments under the plan and to comply with the plan[.]

**Good faith**

Good faith under § 1225(a)(3) allows the Court to take a broad look at how the debtor has used Chapter 12. The good-faith inquiry looks at the totality of the circumstances around the plan and the bankruptcy filing, and examines the debtor's fairness in dealing with his creditors, including whether the debtor has stated debts and expenses accurately, made any fraudulent misrepresentations to mislead the bankruptcy court, or unfairly manipulated the Bankruptcy Code. *Barger v. Hayes Cnty. Non-stock Coop. (In re Barger)*, 233 B.R. 80, 83-84 (B.A.P. 8th Cir. 1999). The debtor's conduct prior to filing bankruptcy, by itself, does not resolve the good-faith issue, but is relevant to the analysis. *Id.* at 84. The focus is on a debtor's motives, and the distinction between permissible and impermissible motives is often a fine line. *First Nat'l Bank of Sioux City v. Kerr (In re Kerr)*, 908 F.2d 400, 404 (8th Cir. 1990).[8] Evidence of an improper motive must be clear. "Debtors often wish to shelter whatever assets they can from their creditors, and the Bankruptcy Code permits them to do so. We therefore must require a pattern of concealment, evasion, and direct violations of the Code or court order which clearly establishes an improper motive before allowing dismissals for bad faith." *Id.* (citations omitted).

---

[8] *Kerr* is a Chapter 11 case, but the same good-faith confirmation requirements exist across Chapters 11, 12, and 13, so the analysis is applicable here. 8 *Collier on Bankruptcy* ¶ 1225.02[3] (16th ed. 2024) ("Th[e] good faith standard [in § 1225(a)(3)] is the same as that applicable to confirmation of chapter 11 plans and chapter 13 plans. Cases considering the scope of the good faith requirement under those two chapters will be equally relevant in chapter 12 cases.").

The creditors argue that the circumstances of the filing of this Chapter 12 case closely resemble the circumstances held by the Eighth Circuit to constitute bad faith in the seminal case of *Noreen v. Slattengren*, 974 F.2d 75 (8th Cir. 1992). The *Noreen* decision affirmed the bankruptcy court's finding of bad faith where the debtor's Chapter 13 case was filed only eleven days before the creditor's civil lawsuit for damages was set to go to trial, thereby preventing her from having her case heard; the Chapter 13 case was filed not because of debts that came due in the ordinary course, but in anticipation of the likely damage award resulting from the civil suit; and the initial plan offered a meager payment plan, which was increased only in response to the creditor's objection. *Id.* at 77. Lind and Fleecs point out that the present case was filed on the eve of the state court trial in their case against the debtor, that they hold the vast majority of the unsecured debt owed by the debtor, and the plan proposes a meager repayment amount.

Creditors often believe a bankruptcy case was filed solely – and unfairly – to impede their efforts to collect a debt. However, "[i]t is not unusual for bankruptcy petitions to be filed on the eve of foreclosure. If that fact, taken alone, could support a finding of a bad faith filing, very few cases would survive." *In re Weldin-Lynn, Inc.*, 79 B.R. 409, 411 (Bankr. E.D. Ark. 1987). In fact, the central purpose of the Bankruptcy Code is to provide honest but unfortunate debtors with a fresh start where they can "reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (citation omitted). But bankruptcy does more than safeguard the debtor – it protects creditors as well by allowing for reorganization and preserving assets for repayment with the intention of balancing the interests of creditors and debtors. *In re Anthony*, 481 B.R. 602, 622 (D. Neb. 2012).

Here, Fleecs and Lind assert that the impetus for filing was their state court lawsuit. However, that is an oversimplification of the situation. Between the dismissal of debtor's prior Chapter 12 case and the filing of this case, debtor's assets and finances changed dramatically. Debtor used to own and farm approximately 1,600 acres of land and owned substantial farm equipment. That land and equipment secured an operating line and related loans from Custer Federal State Bank. The debt to Custer Federal grew to more than $1,700,000.00, and the debtor's earlier bankruptcy filings were primarily due to that overwhelming debt, not the obligations to Fleecs and Lind. Debtor ultimately was unable to service that debt or work it out in prior bankruptcies and the real estate and equipment were lost to foreclosure. At the time this case was filed in 2022, the debtor had already lost most of his land and equipment and began trying to salvage a substantially scaled-down farming operation. The lawsuits by Fleecs and Lind, as well as a boundary fence dispute with a neighbor, were impairing his ability to do so.

Considering the substantial change in debtor's circumstances after the Custer Federal foreclosures, the Court is comfortable saying the circumstances of this case are not at all like those in *Noreen*. Here, a debtor who had just lost almost everything is simply trying to salvage what he has left and gain some breathing room in which to reorganize his remaining debts and protect his remaining assets. He is literally starting over. The evidence indicates he is taking action with sincere efforts to replace his co-op wages and maintain his operation without borrowed money, with the hope of eventually expanding into livestock again. His efforts have so far been adequate to maintain his small farming operation and help support his family.

As part of the lack-of-good-faith argument posed by Fleecs and Lind, they point out the circumstances of their judgments against the debtor for cows and calves that "disappeared" while in the debtor's possession without explanation. Some of this was due to death loss, but most of the loss was never explained. However, the issue of fraud was *not* litigated, either in the state court or in a dischargeability action in the bankruptcy case. Therefore, the Court will not draw any negative inferences or conclusions with respect to the good-faith analysis simply because of the civil judgments held by Fleecs and Lind. Further, as discussed above, debtor appears to be sincere in his efforts to reorganize and move forward with his scaled-down farming operation.

**Best interests of creditors**

Under the best interest of creditors test in § 1225(a)(4), the debtor must show that the holder of each allowed unsecured claim will receive at least as much under the plan, on a present value basis, as the holder would have received in a Chapter 7 liquidation. The Court must undertake a hypothetical liquidation analysis by first determining the value of the property that would be available for distribution to creditors. That value must then be discounted by the costs likely to be incurred by the trustee in liquidating that property. The net proceeds that would be available to the trustee for payment to creditors must then be further discounted to their present value. The amount that each creditor would receive from a hypothetical chapter 7 liquidation must then be compared to the amount that each creditor will receive under the plan. The amount of scheduled payments under the plan must be reduced by the amount of the trustee's fees and by the anticipated amount of administrative expenses. The amount that each creditor will receive under the plan must then be discounted to present value so that it may be compared to the present value arising from a liquidation. 8 *Collier on Bankruptcy* ¶ 1225.02[4] (16th ed. 2024).

Lind and Fleecs challenge the valuations used by the debtor in his liquidation analysis, particularly his use of assessed values for his real estate. They rely on the 2023 Reports and Opinions of the Property Tax Administrator of the Nebraska Department of Revenue, which was prepared to "inform the Tax Equalization and Review Commission of the level of value and quality of assessment for real property in Custer County." Fil. No. 340 at 2. Using this resource, the creditors argue the debtor is understating his real estate value by some $65,000 in market value and $52,000 in liquidation value.

In support of the valuations used in the liquidation analysis, the debtor testified at trial that he based his estimates on some recent sales of nearby properties as well as his lifetime of familiarity with land quality and value in the area. Fleecs and Lind, on the other hand, failed to produce any direct evidence of the value of the property that they contest. While a landowner is free to testify as to the value of his real estate, a non-owner must produce an expert witness who is capable of testifying as to the value of real estate such as a licensed appraiser. *Situm v. Coppess (In re Coppess)*, 567 B.R. 893, 895 (B.A.P. 8th Cir. 2017) (holding that creditor who failed to introduce any expert valuation evidence of his own could not show that debtor's real property was undervalued and that proposed plan should not have been confirmed on that basis; in valuing the property, bankruptcy court properly relied on values listed on debtor's bankruptcy schedules, given that debtor, as property owner, was qualified to opine on its value); *Schmidt v. Thayer Cnty. Bd. of Equalization*, 624 N.W.2d 63, 69 (Neb. Ct. App. 2001) ("A resident owner who is familiar with his or her property and knows its worth is permitted to testify as to its value without further foundation; this principle rests upon the owner's familiarity with the property's characteristics, its

actual and potential uses, and the owner's experience in dealing with it."). Despite having more than two years since this case was filed, Fleecs and Lind have failed to produce an appraisal of the involved real estate.

Had Fleecs and Lind provided substantive valuation evidence for the real estate – such as appraisals – rather than hypothetical arguments based on generic information for taxing authorities, their argument may carry more weight. Based on the evidence before the Court, it appears the debtor's liquidation analysis calculations are essentially reliable, although a recalculation of the exemptions may result in minor additional funds for creditors.

The creditors also assert the debtor failed to list all of his personal property, alleging that farm equipment listed on schedules filed in the previous bankruptcy cases of the debtor and his wife does not appear on the schedules in this case. The debtor explained that the majority of his equipment was sold by Custer Federal in 2021, and introduced into evidence his tax returns showing the capital gains. The creditors have failed to point to any evidence to contradict debtor's explanation or any specific asset that may be missing from the schedules. Accordingly, there is no evidence that assets have been concealed from the Court or creditors.

**Feasibility**

The Eighth Circuit's feasibility test considers whether provisions in a plan are achievable given the unique facts of the case, and a plan must have a rational likelihood of success in order to be confirmed. *In re Michels*, 301 B.R. 9, 17 (Bankr. N.D. Iowa 2003), *aff'd*, 305 B.R. 868 (B.A.P. 8th Cir. 2004) (citations omitted). In considering feasibility, the court must contemplate "the probability of actual performance of the provisions of the plan. . . . The test is whether things which are to be done after confirmation can be done as a practical matter under the facts." *Bowman v. Bond (In re Bowman)*, 253 B.R. 233, 238–39 (B.A.P. 8th Cir. 2000) (quoting *Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir. 1985)).[9] In other words, there must be reasonable assurances from the debtor that the plan can be completed and that the plan will cash-flow. *Farm Credit Servs. of Am., PCA v. Swackhammer (In re Swackhammer)*, 650 B.R. 914, 921 (B.A.P. 8th Cir. 2023).

To this end, the debtor's income and expense projections are considered in conjunction with his actual past performance to determine feasibility. *Id.* The feasibility determination requires a determination by the court, based on the totality of facts and circumstances, that the plan falls somewhere along the continuum of feasibility. *Id.* Factors to be considered include the value and equity of the debtor's assets, the nature and amount of the debtor's liabilities, the efficiency of the debtor's operations, the debtor's pre-petition transactions with creditors, the debtor's historical performance, the terms of the proposed plan, and other evidence showing the likelihood of success in Chapter 12. *Id.* Throughout the analysis, the court should be mindful of the "vicissitudes of the

---

[9] *Bowman* and *Clarkson* are Chapter 11 cases. The feasibility test is also standard in Chapter 11 and Chapter 13 cases, although the analysis in a Chapter 12 case is likely more similar to the feasibility analysis in a Chapter 11 case than in a Chapter 13 case due to the less predictable nature of income and expenses inherent in Chapter 11 and 12 debtors' business operations. 8 *Collier on Bankruptcy* ¶ 1225.02[5] (16th ed. 2024). Accordingly, case law discussing Chapter 11 plan feasibility is useful in a Chapter 12 context.

farm economy" and the variables with which the debtor must deal. *In re Doud*, 74 B.R. 865, 869 (Bankr. S.D. Iowa 1987).

Some of the discussion in the sections above is applicable here. The debtor has established that he is able, so far, to maintain his operation on a shoestring, with his own income rather than borrowed money. His farming projections appear to be reasonable and based in fact. The creditors emphasize the loss of the debtor's regular employment at the co-op, but the debtor has shown his ability to make up for that income in other ways. He seems willing to work hard and create employment opportunities for himself at a time in life when many people start to think about slowing down or retiring. His projections do not contain overly optimistic assumptions and are supported by his actual income and expenses during the pendency of this case. Further, debtor testified that he has the first annual payment ready to be paid and will have enough money for the second payment as soon as he sells his crop. There was no evidence to the contrary. Therefore, the plan meets the feasibility standard.

## CONCLUSION

The objection to confirmation by Lind and Fleecs is overruled. The debtor's sixth amended plan was filed in good faith, meets the best interests of creditors test, and is feasible, and likewise meets the other requirements of §1225(a) to be confirmed. Because the plan is confirmable, the motion to dismiss will be denied.

IT IS ORDERED: The debtor's sixth amended Chapter 12 plan (Fil. No. 222) is confirmed. The Motion to Dismiss filed by Fleecs and Lind (Fil. No. 229) is denied.

DATED: December 3, 2024

BY THE COURT:

/s/ Thomas L. Saladino
Chief Judge

Notice given by the Court to:
 *Terry K. Barber
 Michael S. Borders
 James A. Overcash, Chapter 12 Trustee
 United States Trustee

Movant (*) is responsible for giving notice to other parties if required by rule or statute.